Filed 6/7/24  Wang v. Iverson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| LIREN WANG, | |
| Plaintiff and Appellant, | E080240 |
| v. | (Super.Ct.No. MCC1800591) |
| MICHAEL DENNIS IVERSON et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County. Raquel A. Marquez, Judge; Judith F. Hayes, Temporary Judge (pursuant to Cal. Const., art. VI, § 21).[1]

Affirmed.

Liren Wang, in pro. per., for Plaintiff and Appellant.

Graff & Associates and C. Benjamin Graff for Defendants and Respondents, Charles Benjamin Graff and Graff & Associates.

---

[1] Judge Marquez was the trial judge assigned for the bulk of the proceedings. Judge Hayes presided at the November 8, 2022 hearing on the motion for attorney fees.

1

Law Offices of Michael D. Iverson and Michael D. Iverson for Defendants and Respondents, Michael D. Iverson and Law Offices of Michael D. Iverson.

The attorneys who are respondents in this appeal obtained summary adjudication on claims by a property owner that they caused him damage through professional negligence and breaches of fiduciary duty while representing him in a dispute over his duties under a judgment to maintain a portion of his property dedicated to use as a pet cemetery.

The attorneys represented him in a dispute that arose when a pet owner brought a motion to enforce the pet cemetery judgment. The property owner followed one of the attorney's advice to respond by asserting the court did not have personal jurisdiction and withhold submitting evidence that he was maintaining the pet cemetery as required. The trial court rejected the jurisdictional argument, found the property owner did not comply with the judgment, and appointed a receiver based on the pet owner's declaration and attached exhibits. After investigating, and over the course of years, the receiver repeatedly advised the court the property owner was not maintaining the property as required by the judgment and requested permission to make the necessary improvements. The court repeatedly found the property owner was not in compliance and ultimately approved the work the receiver recommended before discharging the receiver. That case is now final.

The trial court concluded the property owner could not establish the attorneys' conduct caused the property owner's injuries because the court repeatedly and

2

consistently found the owner was not living up to his obligations. We agree with the trial court's analysis and therefore affirm the judgment.

As we will describe, the appellant has proven unwilling to accept rulings against him over the many years of this property dispute, and we anticipate this ruling will not satisfy him to any greater degree. Nevertheless, it is our judgment that he has received ample and fair attention from the judicial system. We will thoroughly recount the proceedings here. At some point all litigation must end. We suggest this litigation has reached that point.

## I

### FACTS

This case concerns the legal representation appellant Liren Wang received from respondents Michael Iverson and C. Benjamin Graff in a dispute over the upkeep of property known as Angel's Rest Pet Cemetery located at 18247 Collier Avenue in Lake Elsinore.[2]

The use of the property has long been the subject of controversy. The property was dedicated for use as a pet cemetery before 1991, when it was acquired by Barbara MacIntosh. The prior owner did not disclose the dedication to MacIntosh, and when she

---

[2] Because we review an order granting summary adjudication, we rely on facts that are undisputed, have been established through litigation, or come from legal documents like contracts, court orders and decisions, or pleadings. Where a factual question is disputed, we note that.

learned of it from Marilyn Allen, whose pet was interred there, she sued to void the dedication. (*Allen v. MacIntosh* (Jan. 13, 2021, E073408) [nonpub. opn.].)

In December 2002, the parties to the MacIntosh lawsuit settled. The settlement agreement voided the original dedication, opened a portion of the property for development to its "highest and best use," and dedicated a portion of the property for use as a pet cemetery under covenants, conditions, and restrictions (CC&Rs) to be recorded on the property. The settlement agreement was reduced to a judgment. (*MacIntosh v. Fisher, et al.* (Riv.Super.Ct., Dec. 18, 2002, No. CIV217431).)

The judgment, settlement, and CC&Rs set out the obligations of the owners of the property to repair and maintain the pet cemetery. "That portion of the Property designated as the 'Pet Cemetery' . . . shall be and is permanently restricted to use as a pet cemetery. The parties shall obtain and comply with a modified Conditional Use Permit from the CITY OF LAKE ELSINORE to allow such continued use into perpetuity." The judgment required MacIntosh to pay up to $15,000 to fund specified repairs and improvements to the cemetery. That work included general cleanup and gardening work, installing an automatic irrigation system, planting grass, shrubs, and trees, resetting grave markers, providing trash receptacles and a new sign, and, if funds remained, repairing or replacing a gazebo and benches.

The judgment separately required MacIntosh to install a fence with lockable gates. "Until a more permanent fence as required by, and building permits are issued by, the CITY OF LAKE ELSINORE is installed, BARBARA G. MacINTOSH shall install a six

4

foot high chain link with top rail fence, or other comparable type of fence, around the Pet Cemetery with lockable gates (one on Collier and one on Road Easement), and the Property owner(s) shall keep the gates to the Pet Cemetery locked and shall provide keys to any PET OWNER or such owner's legal heirs, executors, administrators, or assigns within fifteen (15) days of written request mailed or delivered to BARBARA G. MacINTOSH or any subsequent transferee or owner(s) of the Property."

The judgment, settlement, and CC&Rs directed that the pet cemetery would thereafter be repaired, kept up and maintained by all owners, present and future. Owners of the property were made "responsible for water and utilities for the maintenance and upkeep of the Pet Cemetery adequate to keep all vegetation in a green, healthy condition at all times and to maintain the Pet Cemetery in a manner comparable to a well maintained human cemetery" and required to "provide weekly upkeep and maintenance of the Pet Cemetery and . . . comply with any requirements of the CITY OF LAKE ELSINORE regarding the Conditional Use Permit." The CC&Rs specify "[a]ny owner or owners of the Property shall . . . provide and pay for, and shall require as a written term of any sale or transfer of the Property that the transferee or new owner or owners shall provide and pay for, repair, upkeep and maintenance of such landscaping and improvements as may be on the Pet Cemetery pursuant to the Judgment, Agreement, and/or CUP, as necessary, but not less than weekly, and including but not limited to" the items that the judgment specified the former owner would fund—"a six-foot high chain link top rail fence . . . with lockable gates," an automatic irrigation system, grass, shrubs,

5

trees, trash receptacles, a new sign, and a gazebo and benches. All owners were also required to obtain and maintain liability insurance covering the property.

The documents repeatedly say these obligations run with the property and bind future owners. "Future sales or transfers of the Property shall be subject to the terms of this Judgment, the terms of the Agreement, the CC&R's, the Conditional Use Permit, and the specific requirement that any future purchasers and/or owners of the Property shall be responsible for maintenance, upkeep and repair of the Pet Cemetery, no less than weekly." The CC&Rs provide each of its conditions and restrictions "shall run with the land and with said Property and each part or parcel thereof, and shall bind [the owner], her successors, transferees, grantees and assigns, all parties, purchasers, and owners." All owners also benefit from the provision allowing the rest of the property to be developed to its highest use. That includes Wang, who operated a towing business on that portion of the property.

The City of Lake Elsinore, any owner of an animal interred in the cemetery, as well as the legal heirs, executors, administers, and assigns of any such owners have the right to enforce these conditions and restrictions. The judgment specifies that the court retained jurisdiction "to decide further issues and make any further orders necessary to carry out the terms of this Judgment, the Agreement, the CC&R's, the CUP . . . and to resolve any violation or alleged violation of the terms of this Judgment, the Agreement, the CC&R's, and/or the CUP."

6

After MacIntosh, the property changed hands several times. According to Wang, MacIntosh sold the property to Gary and Carrie Brown, who sold the property to William Bell. In December 2013, Wang and his wife bought into these obligations by purchasing the property from Bell.[3] In December 2016, Marilyn Allen, who was a signatory to the original settlement agreement, filed a motion in the pet cemetery case asking the court to set an order to show cause why the court should not appoint a receiver under Code of Civil Procedure section 564, subdivision (b)(3), to ensure compliance with the CC&Rs. She alleged Wang was failing to maintain the pet cemetery as required.

Allen submitted a sworn declaration supporting her motion. She recounted the terms of the judgment, the settlement, and the CC&Rs and described how Wang had failed to comply with their requirements. "[Wang] ha[s] disobeyed the Judgment . . . [and is] failing to maintain the Pet Cemetery in a manner comparable to a well-maintained human cemetery, including, but not limited to, failures such as not maintaining a locking gate and providing keys, failing to maintain the vegetation in a green healthy state, and damaging and misplacing headstones." Allen reported Wang "admitted to me in writing that he had dug up existing pet graves to put in a sprinkler system in a less expensive manner even though he could have properly installed new sprinkler heads through the sides of the Pet Cemetery as described in the Judgment." Allen also said she believed Wang had not purchased an insurance policy covering the pet cemetery and had placed

_____

[3] Allen identified Wang and his wife, Hui Zhou, as the current owners. Zhou was involved in the pet cemetery case but is not a party here. For simplicity, we refer to Wang as the owner of the property.

"no trespassing" signs around the pet cemetery, though the cemetery was supposed to remain open to visitors to the gravesites.

Wang has insisted throughout the pet cemetery litigation and this case that Allen submitted no evidence to support the statements in her declaration. This is mistaken. A declaration is itself evidence when submitted in support of a motion for summary judgment, provided the declaration is made "on personal knowledge" and sets forth admissible evidence showing the declarant is competent to testify to the matters stated. (Code Civ. Proc., § 437c, subds. (c) & (d); see also *Id*., § 2015.5 [allowing submission of a declaration as evidence where otherwise permitted if signed under penalty of perjury].) Allen also submitted photographs with her declaration. Thus, while the contents of Allen's claims could be disputed by contrary evidence, the record conclusively shows Allen submitted evidence in support of her motion on which a court could rely to find appointment of a receiver to be warranted.

On December 19, 2016, Wang retained Michael Dennis Iverson and the Law Offices of Michael D. Iverson, APLC to represent him in opposing Allen's motion.

When they met, Wang informed Iverson he disagreed with Allen's claims about the condition of the pet cemetery. Wang later sent Iverson a written statement rebutting them point by point. He claimed the pet cemetery was in poor condition when he bought the property and he improved and maintained it to the point that a "majority of the Pet Cemetery [is] covered with healthy green grass." He conceded there were areas of grass that remained yellow despite watering, and said he attempted to repair the irrigation

8

system to address that situation, though he denied his workers had dug through pet graves to do that work. He said the property is bordered by fence on two sides and a wall on the third and said one of the fences included a gate. He admitted the third side of the property did not have a fence and said he would install another gate, if the court required it. He denied any pet gravestones or flower receptacles were damaged and speculated that Allen had seen the property when workers were at the property and had temporarily moved them. He said the "no trespassing" signs are meant to protect the portion of the property where he runs his business, not the portion dedicated for use as a pet cemetery. He claimed he had purchased liability insurance for the pet cemetery in October 2015, after Allen raised the issue.

In February 2017, Wang filed an opposition to Allen's motion. However, he did not raise any of these factual objections. Instead, the opposition, which was styled as a special opposition challenging the court's jurisdiction, argued the court did not have personal jurisdiction over him because Wang was not a party to the pet cemetery case and had not been served with process. He conceded he was the owner of the property and had received by mail a copy of Allen's motion and related documents. He also attempted to reserve the right to make a substantive opposition in case the court determined it did have jurisdiction. According to Wang, Iverson recommended this limited response on the theory that including a substantive response would give the trial court personal jurisdiction. Iverson himself conceded in deposition testimony that he proposed and, with Wang's agreement, pursued this strategy. Wang contends the strategy was an error and

that Iverson should have filed a motion to quash and appear in court by special appearance to challenge personal jurisdiction.

The strategy did not work. On February 14, 2017, the trial court issued a tentative ruling which indicated it would appoint a receiver. Neither party requested oral argument. According to Iverson, Wang directed him not to request oral argument, but then changed his mind after the deadline for requesting oral argument had passed. Iverson said he introduced Wang to respondent C. Benjamin Graff after receiving the tentative ruling because they were discussing the possibility of appealing the trial court's ruling, and Iverson did not handle appellate work. Wang had Graff represent him at the hearing. According to Iverson, Wang said he did not want to pay both Graff and Iverson, so that meeting ended Iverson's involvement in the case.

The next day, the court held a hearing on Allen's motion, with Graff representing him. Michael Grant West attended the hearing as the proposed receiver. The court noted it "didn't receive any request for oral argument," and refused Graff's request to present argument because a request is required under local rules. The court acknowledged the argument in the opposition, but concluded the court did "have jurisdiction because it's clear that the property owners were put on notice in regards to the prior order in this court as to the maintenance of the property." The court faulted Wang for failing to address the substance of the motion in the alternative and invited him to appeal the ruling. The court found Wang to be "in violation of the Judgment of this Court" and appointed West as receiver.

Wang now argues, as he argued throughout the pet cemetery case, that the trial court did not find him in violation of the judgment. He bases that argument on the court's statement he had presented no substantive opposition and his own claim that Allen presented no evidence, just a declaration. This is a mistaken view of what happened, and it infects his position on appeal. Allen presented evidence through a declaration and photographs, and Wang presented no evidence to contradict that evidence. The court credited the declaration and found as a matter of fact that Wang, as the owner, was in violation of the judgment. The court then appointed a receiver based on that finding. While the decision not to contest the facts may have been a poor one, the record conclusively shows the court found Wang violated the judgment based on evidence in the record.

On February 24, 2017, Wang added Graff as counsel in the pet cemetery case. That day, he filed a motion for reconsideration of the receiver ruling under Code of Civil Procedure section 1008. The court denied the motion "because there are no new or different facts, circumstances, or law shown by moving parties." Wang appealed, but on June 12, 2017, this court dismissed the appeal as abandoned after Wang failed to timely file a correctly completed civil case information statement.[4]

_____

[4] Wang claims Graff or Iverson abandoned the appeal without his knowledge. That point is disputed. Iverson professed having no knowledge of the abandonment of the appeal. Graff said he abandoned the appeal because Wang had told him "he knew that the property was not up to the standard that was required of him which meant that there was no substantive basis to carry on the appeal beyond that." Graff said he allowed the appeal to be dismissed as abandoned because it would be "bad faith if we proceeded."

11

On September 11, 2017, the receiver submitted a report to the court. The receiver noted his appointment arose because owners of pets interred in the pet cemetery had complained they could not get Wang to maintain the pet cemetery in accordance with the CC&Rs and the judgment.[5] He said his purpose was to "validate or invalidate the Pet Owners' claims and work to find a recommendable solution to any issues that may be occurring at the Property." The receiver said he reviewed the judgment and CC&Rs, made multiple trips to the property, summarized the rights and responsibilities of the property owners, and then evaluated compliance.

The receiver first noted the fencing and gates were not in compliance. "The current fencing . . . fails to surround all four sides of the Pet Cemetery. During trips to the Property, the Receiver observed that the current fencing is roughly six feet high, but currently appears to only secure the Easterly (between the Pet Cemetery and frontage on Collier Ave.) and Westerly sections of the Pet Cemetery (between the Pet Cemetery and Towing Yard). The Southerly section . . . has a much smaller gate that appears to have been a temporary install that occurred at different time than the Easterly and Westerly sections. As of the final Property inspection there is no gate on the Northerly section of the Pet Cemetery. This section . . . has been lined with orange safety cones and various planter materials. . . . [W]ithout fencing, the Pet Cemetery is left unsecure. During all

---

[5] Wang admitted the receiver wrote this in his report but asserted in his response to Iverson's proposed statement of undisputed material facts that "the Report's description of the true reason why 'the Receiver's appointment occurred' is completely wrong." This is not a factual dispute and again reveals Wang's misunderstanding of the legal significance of the order appointing the receiver.

12

visits to the Property the entry gate on Collier Avenue has been left open. This is due to tow yard service vehicles needing to get to the Tow Yard to move vehicles into and out of the Property. . . . Finally, . . . there are no locked gates on the Property to provide the Pet Owners access to the Pet Cemetery. The previously mentioned issue with site security would be negated with fencing and the two locked entry points; one along Collier Avenue and one along the Road Easement." Wang did not contest that the fencing and gates were not compliant, though he claimed the CC&R has a "loophole" in that the first owner was supposed to install them. To resolve these problems, the receiver recommended installing a six foot fence along the one open side of the property and installing two lockable gates on the east and north sides of the property. The cost of these two fixes would be between $4,113 and $5,950, depending on who performed the work.

The receiver found the condition of the pet cemetery grass did not comply with the judgment and CC&Rs. "There are multiple locations throughout the Pet Cemetery where it appears that irrigation system is not providing ample watering of the grass. This is coupled with the fact that pooling of water was observed at various sections of the Pet Cemetery, which the Receiver believes may be caused by leaks and or breaks in irrigation lines. . . . Though the lawn appears to be mowed regularly, there are large sections of dead grass." Observing how the sprinkler system worked, he concluded some parts of the property receive no water and repairs to the irrigation system are required. Based on conversations with people who care for a nearby human cemetery, he concluded the brown patches would require targeted reseeding, use of fertilizer, and hand watering. The

13

receiver estimated the cost of fertilizer and reseeding would be about $2,050 and the cost of restoring the irrigation system would depend on what repairs an inspection showed to be necessary.

The receiver also found other vegetation on site required maintenance to return to compliance. He recommended removing one tree because it was a safety hazard. He recommended trimming the property's other 14 trees. Finally, he noted the need to restore buffer plantings—trees or shrubs—along the perimeter of the property. This vegetation maintenance would cost about $6,500. The receiver recommended that the court require Wang deposit $32,000 with the court to allow work to be completed.[6]

On September 13, 2017, Wang filed a declaration objecting to portions of the receiver's report. In this filing he was represented by Iverson and Graff.[7] Wang continued to argue the trial court did not have personal jurisdiction over him, though he conceded the court had jurisdiction to enforce the judgment. He complained the receiver was appointed only because he was prevented from making a substantive objection at the outset. He also included substantive objections to the receiver's recommendations. He argued that only MacIntosh was required to *install* fencing around the property, and subsequent owners were required only to *maintain* the fencing. He accepted that

---

[6] The receiver proposed alternative and more expensive solutions of dividing the pet cemetery from the rest of the property and endowing it or moving the existing graves to another cemetery. However, Wang and the receiver agreed not to pursue those solutions but to attempt to bring the pet cemetery into compliance instead.

[7] Though Iverson said he was not involved in the case after February 14, 2017, the declaration lists Iverson and his law firm, as well as Graff and his law firm, as attorneys for Wang.

subsequent owners, including himself, were responsible for maintaining the grass in a healthy condition. However, he claimed that "[p]rior to April, 2017, the grass was green and well maintained," and blamed subsequent browning on excessive heat, Allen's interference with his attempts to repair irrigation sprinklers in 2015, and government water conservation directives. He objected to removing (though not trimming) trees because the grass shaded by trees was in better condition than grass exposed to full sun. At a later deposition Wang said he objected to trimming the trees as well, because doing that would reduce shade. Finally, he objected to planting buffer vegetation around the perimeter of the property because "[t]here is no proof that any such vegetation was . . . in place during MacIntosh's care of the Pet Cemetery."

On September 14, 2017, the trial court held a hearing on the status of the receivership. Wang was represented by Graff at the hearing. The court said it had not received the receiver's report because it was not imaged and had not received Wang's declaration, which was filed late. After hearing argument, the court approved the receiver's report. Wang complained Graff agreed to the receiver's recommendation without his permission—Wang had proposed replacing live grass with artificial turf—however Graff argued against aspects of the receiver's recommendation that in Wang's view exceeded his obligations under the judgment and CC&Rs, including his objections to making him pay to install a fence with gates.

In October, the receiver moved for leave to borrow money against the property. He requested leave to secure a debt of $50,000 to pay for court-approved improvements,

15

past and future receiver's fees, and a judgment-mandated insurance policy. In his motion, the receiver identified the dispute over whether Wang was responsible for building a fence and indicated he would not begin that work until the dispute had been resolved. However, he sought to borrow funds to complete the remaining court-approved improvements.

In November, the court held a hearing on the receiver's motion to borrow money. Graff appeared on behalf of Wang. The trial court noted Wang filed no response to the motion, though he requested oral argument. Graff represented that they were relying on their earlier response to the receiver's report and asked that Wang be permitted to address the court. The court advised Graff and Wang that they could not rely on previous filings to raise issues for a hearing, at least without providing notice to the court and other parties but avoided resolving the issues Wang sought to contest for another time. "For purposes of today's hearing there was an actual motion filed, and so it's a motion for, essentially, to be able to borrow money to enable the receiver to be able to fulfill their duties. . . . [T]he specifics of what they are going to do with that money isn't before me as far as are they going to build a fence or do this or that." The court issued an order authorizing the receiver to borrow $50,000 against the property to pay for the improvements.

In March 2018, the receiver moved to address outstanding issues with repairing the irrigation system and installing fencing on the property. The receiver represented he had arranged for "small efficiency improvements" to the irrigation system which ensured

16

water reached 85 percent to 90 percent of the cemetery and had obtained a proposal for additional modifications to improve the irrigation system. He said he sent the proposal to the parties and to other pet owners, seeking feedback. Five people responded, all of them opposed the further modifications. Wang said he believed the system worked efficiently and there was no need to incur further costs. Allen and three other pet owners opposed the additional work out of concern that it would disturb the graves.

The receiver also raised the question whether Wang should be required to install new fencing under the judgment and CC&Rs. The fence was needed to prevent vehicles using the front section of the pet cemetery property as a driveway to access Wang's business. The receiver offered his opinion that Wang should not bear the full cost of installing new fencing, because that obligation was personal to MacIntosh who had failed to comply. He asked the court to order Wang and the pet owners to split the cost of installing fencing along the open side of the property. In May, the receiver informed the court he had obtained a bid from a yard maintenance company to address weed overgrowth along the front fence, vegetation overgrowth around headstones, weeds and gopher holes throughout the property, and fertilizing and reseeding the lawn. The work had been completed by April 27, except that Wang hadn't provided a trash bin for debris disposal, and reseeding awaited his compliance with a schedule for increased watering.

Before the motion was resolved, Wang obtained new counsel. He said he had identified Matthew Knez as someone who could represent him in an attorney malpractice action after he became concerned about the quality of the work Iverson and Graff had

provided. He ultimately hired Knez to represent him in the pet cemetery case, and on April 2, 2018, filed a substitution of counsel, replacing Iverson and Graff with Knez. This substitution formally ended the involvement of Iverson and Graff in representing Wang in the pet cemetery case. Knez represented Wang in responding to the receiver's motion. Knez also represented Wang in filing a complaint against Iverson and Graff for professional negligence, which we will discuss later.

At that hearing, the parties represented they had worked out their differences. The court granted the motion in part by ordering that the front gate be locked. "It's my understanding that those have been kept locked. That has alleviated some of the concerns of the individuals coming into the cemetery. It seems that that solution is reasonable rather than an additional fence being installed." The parties agreed no order was necessary to resolve the irrigation issues. The court granted the motion in part, requiring the front gate to be kept locked, and deemed the motion moot as to irrigation issues.

The parties failed to find solutions to the remaining issues, and the dispute went back to the trial court on Allen's motion to compel the receiver to bring the property into compliance with the judgment. In September 2018, the court held a hearing on this motion. Allen complained vehicles from the towing company continued to encroach on part of the pet cemetery and juveniles were entering the property and caused damages due to the absence of a fence. The court told Allen those issues had not been properly raised and suggested she raise them in writing. The court continued the hearing for three months to allow the parties to work out their differences, "propose a plan for resolving the issues

18

of irrigation coverage, water pressure for the irrigation system, and methods of improving the deteriorated visual condition of the pet cemetery." The court ordered interested parties to submit proposals (including written estimates from licensed contractors) to the receiver and ordered the receiver to file a report with summaries of the parties' proposals as well as his own recommendation supported by bids for any work to be completed.[8]

In November 2018, the receiver filed his report. He identified the work he had completed, including trimming the trees and grinding down stumps, repairing sprinkler heads and installing uniform nozzles, attempting weed treatment and reseeding that failed due to continued problems with water supply, and installing new sprinkler heads to provide greater water coverage despite low water pressure of the municipal water system. The receiver noted irrigation presented problems that could not be completely resolved without watering some portions of the property by hand because the property owners and the pet owners agreed not to undertake improvements to the irrigation system that would involve trenching through the gravesites.

The receiver requested the court's permission to complete six "items to bring the Pet Cemetery into compliance and attempt to ensure that compliance is maintained once the Receiver is removed from the case." He proposed to (i) provide another weed treatment for $956, (ii) reseed the property either in whole (for $4,200) or in part (for $2,200), (iii) install a fence with two locked entry gates for $2,720, (iv) move the irrigation controls from inside the towing business property to a position on the pet

_____

[8] Wang purports to dispute this statement of undisputed facts. However, his objection is to the respondents' argument in their summary judgment briefing.

cemetery property for $760, (v) plant 11 bougainvillea plants along the back perimeter for $495, and (vi) move and reset about six headstones that had been moved for $200. The receiver noted Wang, though still the property owner, no longer ran the towing business on the adjacent property, which he said increased the need for fencing and locked gates as well for moving the irrigation controls. Allen agreed with these items and proposed more items the receiver did not endorse.

Wang opposed the proposed work. Wang again argued installing a fence was not required under the judgment and CC&Rs and added that Allen's delay in seeking the installation meant the claim was barred by laches. He opposed moving the irrigation controls as an unnecessary expense. He acknowledged he no longer operated the towing business, but represented he still had full access to the old controls. He opposed planting new bougainvillea plants because there was no evidence buffer vegetation was in place at the time of the judgment, which he argued meant planting the bushes was not required maintenance. He also expressed concern that the new plantings could interfere with the irrigation system. He did not oppose resetting headstones that had been moved, but expressed doubt that Allen knew which headstones needed attention. As for the work of weeding, reseeding, and improving irrigation, Wang objected to the work the receiver had completed and suggested more limited interventions, most to be undertaken by himself.

In December 2018, the court approved the receiver's report and authorized the work the receiver proposed. At a hearing on the motion, the court rejected Wang's

20

argument that he was not responsible for completing the fencing of the property. "I think a reasonable interpretation of the judgment is that if in fact MacIntosh didn't perform the fencing, which is required by the judgment, then the existing owner would have to provide the fencing. If it wasn't finished, for instance, subsequent owners would have that responsibility." The next day, the court entered an order authorizing "the Receiver to perform the work on the pet cemetery set forth in paragraph 17 of his report." The court set a hearing for May 8, 2019 and ordered the receiver to file a final status report after the work was completed.

In February 2019, Wang filed a substitution of attorneys, removing Knez and the Knez Law Group LLP and substituting himself as attorney. In May, Wang hired Kenneth D. Sisco as his attorney in the pet cemetery case.

In May 2019, the receiver filed his final report. He represented that all the work had been completed. According to the receiver, the weed treatment was successful, and costs were as bid. The landscaper reseeded the entire property but charged the lower price quoted for the partial reseed. The receiver reported nearly all the grassy areas of the pet cemetery had filled in and were green, except for a section that was supposed to be hand-watered by Wang. The landscaper moved the irrigation controls to the property and installed electronic timers at bid cost. The receiver ordered installation of irrigation covers to protect electric components from exposure to water which increased the cost by $150. The landscaper planted 11 bougainvillea plants at the bid cost and reset nine headstones at a cost exceeding the bid by $50. Finally, a fencing company installed a

21

fence and two keyed gates for the bid cost, and pet owners were provided with keys to the gates. The receiver also incurred $410.43 in miscellaneous costs and represented that he had unpaid fees of $24,028 for 100.2 hours of work.

Meanwhile, Allen sought a cease-and-desist order to require Wang to stop trespassing or encroaching on the pet cemetery. She reported Wang had allowed vehicles entering and leaving the towing business to drive across a portion of the pet cemetery property. Wang opposed the motion on the ground of laches, arguing Allen had delayed too long to object to the encroachment.

On June 11, 2019, the court held a hearing on the cease and desist motion and the receiver's final report. The court first granted Allen's motion for a cease and desist order, rejecting Wang's argument that delay in raising the issue of trespass barred her claim. The court then turned to the receivership and receiver's fees. After meeting and conferring, at the court's request, Wang and Allen agreed Wang would pay Allen $5,000 by June 14 and they would release all claims against each other. If Wang failed to comply, the receiver would be permitted to record a lien against Wang's property for $28,048. West and Wang signed a mutual release of claims on June 12. The court approved the final report and discharged the receivership effective June 24.

On July 31, 2019, Wang filed a notice of appeal from the cease-and-desist order.[9] Wang argued the ruling was in error because Allen unreasonably delayed her request for an order to cease and desist trespass. On January 13, 2021, this court affirmed in an

_____

[9] The appeal also involved an attorney fees issue not relevant to this case.

22

unpublished opinion, holding Allen's motion was timely and that Wang could not appeal to equitable principles because he had "persistently resisted complying with [his] obligations under the CCRs, as well as the judgment of the superior court directing the erection of the fence, so [he] come[s] to this court with unclean hands." (*Allen v. MacIntosh*, *supra*, E073408.) Wang unsuccessfully petitioned this court for rehearing and the Supreme Court for discretionary review, and remittitur issued on April 22, 2021. Thus, the underlying litigation is final.[10]

But the disputes did not end. On May 31, 2018, Wang filed the complaint in this case, alleging Iverson, Graff, and their law firms had committed professional negligence and breached their fiduciary duty in representing him in the pet cemetery case.[11] The basis for both claims was the attorneys' alleged mistakes in representing him early in the case, when the trial court appointed the receiver as well as in the appeal from that ruling. Wang complained Iverson and Graff did not adequately investigate, failed to present his claims and defenses, failed to request oral argument on the motion to appoint a receiver, failed to comply with court procedures, failed to prepare evidence for hearings, failed to monitor the case, failed to advise him on his appeal, and failed to advise him properly.

---

[10] Wang continued to dispute the issues by filing a complaint with the Commission on Judicial Performance alleging the earlier panel of this court had intentionally distorted his positions and displayed judicial bias. The Commission voted to close the complaint.

[11] Wang also alleged a claim for money had and received because his attorneys had overcharged him. The trial court dismissed that claim at Wang's request so he could appeal the other aspects of the case directly. The claim is therefore not relevant to this appeal, so we omit discussion of it.

These professional responsibility errors, he alleged, were substantial factors in causing him to sustain damages in the pet cemetery case.

On April 6, 2022, Iverson moved for summary judgment or summary adjudication. Iverson argued Wang's professional negligence and breach of fiduciary duty claims fail because the undisputed material facts established Wang cannot show he would have obtained a more favorable judgment or settlement "but for" the negligent representation alleged. He argued the receiver's repeated findings after the court appointed the receiver, confirmed by the court, that Wang was not maintaining the cemetery under the judgment and CC&Rs, shows that Iverson's and Graff's actions as his attorneys, even if professionally negligent, were not "but for" causes of his injuries. Iverson argued the fiduciary duty claim failed because Wang did not allege Iverson breached any duty of confidentiality or loyalty, so the claim was no more than a restatement of a breach of professional responsibility claim.

Graff joined Iverson's motion for summary judgment and submitted a declaration. Graff adopted Iverson's argument that Wang's claims fail because he could not show their legal work and decisions were but for causes of his incurring damages in the pet cemetery case. The fundamental problem, he said, was that Wang had not in fact maintained the pet cemetery as required by the judgment and CC&Rs, so the court had repeatedly found he had not done so. According to Graff, he realized the lack of maintenance finding was correct once he had visited the property in person with the receiver. "Wang had deceived [his attorneys] and had attempted to deceive the Court in

24

the Underlying Case—the pet cemetery was in terrible condition. The pet cemetery had *NOT* been maintained 'in a manner comparable to a well-maintained human cemetery'— *and Wang knew all along that he hadn't maintained it properly.*" Graf said he had advised Wang of his opinion, and that he could not pursue the appeal of the decision appointing the receiver for that reason.

On July 1, 2022, the trial court held a hearing on Iverson's motion. After the hearing, the trial court issued a lengthy ruling granting Iverson's motion for summary adjudication of the professional negligence and breach of fiduciary duty claims. At Wang's request, the court granted Graff's motion to join the Iverson motion and statement of uncontested material facts. The court then granted the motions for summary adjudication on both claims as to both parties because they failed as to causation.

On August 9, 2022, the court issued judgment and a written ruling. The court explained Iverson and Graff presented evidence that "the cause of the receivership getting granted . . . was not because [they] failed to file a substantive opposition or to request oral argument. It was because Wang failed to comply with the judgment and allowed the property to deteriorate." The court concluded "the evidence submitted by Marilyn Allen in the underlying action supported the request for the receivership and was sufficient to justify the granting of the request in the *McIntosh v Fisher* case" and "it is undisputed the Receiver's reports confirm the conditions about which Marilyn Allen complained . . . and that this deterioration was caused by Wang's actions." The court concluded that "it is undisputed Wang failed to bring the property into compliance with the judgment in the

25

underlying case prior to, at the time of, and after the Receiver's appointment." As a result, Iverson and Graff "met their burden of showing that Wang cannot prove the essential element of causation."

That determination shifted the burden "to Wang to show that a triable issue of one or more material facts exists." However, the court concluded "Wang did not state any facts or provide any evidence to create a triable issue of material fact that he would have prevailed in the underlying action of *McIntosh v Fisher*" or "that the receiver was appointed in the underlying action only because oral argument was not requested on the tentative ruling for the order to show cause for the appointment of a receiver." The court concluded therefore that "Wang did not state any facts or provide any evidence to create a triable issue of material fact that Defendants, or any of them, were the cause of any alleged damages claimed by Wang" and determined "there is no triable issue as to a material fact herein as to the First Cause of Action for Professional Negligence or as to the Second Cause of Action for Breach of Fiduciary Duty." The court granted summary adjudication against Wang on both causes of action and entered judgment for Iverson, Graff, and their law offices.

Having lost on the merits, Wang began trying to impugn the trial court judge. On August 19, he filed a motion for recusal on the ground of bias. Wang's memorandum in support of the motion reports that the trial court judges in the pet cemetery case and this case know each other and are friends and suggests the summary adjudication ruling discloses the trial court judge in this case is biased and made her ruling in bad faith. The

trial court ordered the motion for recusal stricken under Code of Civil Procedure section 170.4, subdivision (b), as untimely and also as lacking legal basis. The court denied the motion as untimely to the extent it was meant as a request for a peremptory challenge. Wang filed writs of mandate with this court challenging the order denying the request for a peremptory challenge and the order striking the recusal motion. On August 24, Wang filed a motion for reconsideration of the ruling on summary adjudication, which relied, in part, on the ground that the trial court judge was biased in favor of the judge in the pet cemetery case. In December, a different panel of this court denied the writ petitions. (*Wang v. Superior Court* (E079774) Dec. 8 Order denying petition for writ of mandate; *Wang v. Superior Court* (E079720) Dec. 9 Order denying petition for writ of mandate.) On December 14, 2022, the trial court denied the motion for reconsideration because the entry of judgment deprived it of jurisdiction.

The trial court awarded Iverson and his law firm prevailing party attorney fees and costs in the amount of $174,757.64 and on December 13, 2022, amended the judgment to add that award.

On December 27, 2022, Wang filed a notice of appeal challenging the judgment after the grant of summary adjudication. While this appeal was pending, Wang moved this court to order his case transferred to another Court of Appeal on the ground of judicial bias. We declined his request, and the California Supreme Court denied his petition to review that ruling.

27

# II

# ANALYSIS

A. *Summary Adjudication on Causation*

Wang argues the trial court erred in granting summary adjudication on his professional negligence and breach of fiduciary duty claims because there was a material dispute as to causation when you consider "the evidence the court heard in the underlying case, plus such additional evidence that the court would have heard in the absence of [the alleged] negligence" by his attorneys.

The attorney errors Wang identifies are the decisions not to submit his own declaration about the condition of the pet cemetery and request oral argument on the motion to appoint a receiver. He argues it is improper in this setting to consider the receiver's reports in evaluating whether he would have prevailed because those reports had not been written at the time and could not have played any role in the recreated hearing on whether to appoint a receiver.

Thus, he argues, it does not and cannot matter that the receiver and the receiver's reports would later conclude Wang was not keeping the pet cemetery in the condition required by the judgment. He argues that evidence, and any evidence that came to light because of the order appointing the receiver, is simply irrelevant under the case-within-a-case methodology for evaluating whether legal malpractice caused damages under *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1056-1057 (*Orrick*) and related authorities.

Instead, Wang argues, what the trial court should have considered—and what we should consider in conducting de novo review[12]—is the evidence he would have presented to the pet cemetery trial court if his attorney had not given him the advice he objects to. In that counterfactual world, Wang "would have also filed a declaration under penalty of perjury to deny or explain every allegation Allen launched in her declaration." He points us to the draft statement he provided to Iverson, where he attempted to rebut Allen's declaration point by point. He conceded there were some yellow grassy areas but said a "majority of the Pet Cemetery [is] covered with healthy green grass." He said he had attempted to repair the irrigation system but denied his workers had dug through pet graves in doing that work. He denied any pet gravestones or flower receptacles were damaged. He conceded one side of the property did not have a fence or gate and said he would install another gate if the court required it. He said the "no trespassing" signs Allen complained about were meant to protect his business, not the pet cemetery, and he claimed he had purchased liability insurance when Allen raised it with him.

According to Wang, this recreation of the hearing on the motion to appoint a receiver shows there is a triable fact as to whether he would have obtained a more favorable result *at that hearing*, avoiding the appointment and all the costs and expenses that arose from that decision. If he had avoided appointment of the receiver at that

_____

[12] We apply the same analysis as the trial court in reviewing a decision granting or denying a summary judgment or summary adjudication motion. "We identify the issues framed by the pleadings, determine whether the moving party has negated the nonmoving party's claims, and determine whether the opposition has demonstrated the existence of a triable issue of material fact. (*Orrick*, *supra*, 107 Cal.App.4th at pp. 1056-1057.)

29

hearing, he claims, he would have been allowed to make small changes in the condition of the pet cemetery and avoided most of the expenses he incurred when the receiver later found he was out of compliance with the judgment and persuaded the trial court to allow him to undertake more substantial work on the property.

To be clear, what Wang proposes is that he should prevail on whether Iverson's advice not to submit a declaration or request oral argument caused his damages *even if he were in fact out of compliance with the judgment*.[13] In his view, his rebuttal to Allen's declaration was so strong and the standard for appointing a receiver was so high that the trial court would have ruled in his favor and refused to appoint a receiver, thereby allowing him to avoid further scrutiny.

Even if Wang were correct that we should focus so narrowly on the receivership motion and the order appointing a receiver, we do not believe the evidence he points to creates a question of material fact on the element of causation. The initial questions the trial court faced in deciding Allen's motion were whether Wang was failing to maintain the property in a manner compliant with the judgment and CC&Rs and whether to appoint a receiver to address any noncompliance. (Code Civ. Proc., § 564, subd. (b)(3).) As the case was in fact litigated, Allen presented evidence of noncompliance in her declaration and attached photographs, Wang presented no contrary evidence, and the trial

---

[13] We recognize the parties dispute whether Wang independently chose not to request oral argument or made that decision based on Iverson's advice. Because we are in the posture of reviewing an order granting summary adjudication, we resolve that dispute in favor of the nonmoving party. So, we will assume, for purposes of our analysis here, that Iverson advised Wang not to request oral argument.

court found that Wang, as owner of the pet cemetery, had not complied with the judgment and appointment of a receiver was justified.

Wang argues that absent his attorney's negligence, he would have rebutted Allen's representations point by point, creating a factual dispute over whether he complied with the judgment and therefore creating a factual dispute over whether he would have convinced the court a receiver was not justified. We disagree with this conclusion. First, it has *always* been uncontested (even at the initial hearing) that one side of the pet cemetery was not fenced and the fencing in place lacked lockable gates. It has also always been uncontested that the judgment required fencing around the entire property and two lockable gates, as well as that the lack of fencing was a long-term problem. (We recognize Wang contests whether the judgment and CC&Rs obligated *him* to install fencing when the first owner failed to install it, but we will come to that in a moment.) Wang conceded these points in the draft statement he provided to Iverson. And while Wang's statement said he would install another gate if ordered to do so, it pointedly did not say he would install fencing, the real point of contention. This failure on its own would have warranted the trial court in finding Wang had not maintained the pet cemetery as required and justified appointment of a receiver.

Second, Allen's declaration said Wang had failed to maintain the pet cemetery in a manner "comparable to a well-maintained human cemetery"—as required by the judgment and CC&Rs—by "failing to maintain the vegetation in a green healthy state, and damaging and misplacing headstones." She included photographs taken in September

31

2016, which show areas where grass is not growing—some where the grass is patchy and others where the ground is mostly dirt—and a chipped headstone with vegetation growing over it. She also represented that she had been trying to work with Wang to address these issues since April 2014, to no avail. This evidence supported finding appointment of a receiver was necessary to enforce the judgment.

Wang's response is to insist his own declaration and photographs would have overcome Allen's evidence and led the trial court to deny the motion. This is speculative at best. (See *Loube v. Loube* (1998) 64 Cal.App.4th 421, 427 (*Loube*).) Wang's draft statement, which he did not submit to the court and which he did not sign under penalty of perjury, conceded there were areas of grass that remained yellow despite watering, but claimed a "majority of the Pet Cemetery [is] covered with healthy green grass." He denied any pet gravestones were damaged and speculated that Allen had seen the property when workers were at the property and had temporarily moved them. The bottom line is Allen's photographs showed there had been damage to a gravestone and also that the pet cemetery lawn was much worse than merely yellow in some areas. Wang's attempts to minimize those problems were not sufficient to negate the complaints. Indeed, though Wang contests the relevance of later evidence about the condition of the property, he later repeated many points from his draft statement. Yet those later efforts to show he was maintaining the property in a way that complied with the judgment and CC&Rs repeatedly failed to convince the receiver and the court. We conclude Wang's conviction that his own evidence would have carried the day is

misplaced, and that, even viewed through the narrow lens Wang proposes, he has not shown a material issue of fact on whether his attorney's decisions caused him to suffer damages in the form of costs he incurred in bringing the pet cemetery into compliance with the judgment and CC&Rs.

Wang relies on several cases which emphasize that appointing a receiver is a power to be exercised sparingly, however, those authorities do not call into question the appointment of a receiver in this case. In *Alhambra-etc. Mines. v. Alhambra G. Mine* (1953) 116 Cal.App.2d 869, 874 and *Dabney Oil Co. v. Providence Oil Co.* (1913) 22 Cal.App. 233, 238-239, the courts reversed orders appointing receivers where the desired relief could easily be obtained through an injunction. In *Alhambra* the plaintiff sought to "'shut down the operations of [a] mine and mill' and permit no person to trespass on the property." (*Alhambra*, at p. 874.) In *Dabney Oil*, the plaintiff sought to recover profits realized from operating a business on the property and to stop the defendant from disbursing future profits. Here, Allen did not seek money damages or try to stop Wang from using the property in some way; she sought to force Wang to undertake improvements to the property and to expend resources to do so, and she made that request after Wang resisted efforts to gain voluntary compliance with a judgment.

In *Golden State Glass Corp. v. Superior Court* (1939) 13 Cal.2d 384, the California Supreme Court disapproved appointment of a receiver to take over operations of a business. The plaintiff complained there was dissension in management, but the evidence showed the business was solvent and had significant income. The Court

concluded "a receiver should not be appointed where no actual or threatened cessation or diminution of business operations is shown." (*Id.* at p. 394.) *Golden State Glass* concerns only the appointment of a receiver to take over a foundering business. It provides no support for rejecting the appointment of a receiver to enforce a judgment requiring a property owner to maintain property under specified conditions.[14] Thus, even if the case-within-a-case method allowed Wang to relitigate the initial decision to appoint a receiver—which as we will explain it does not—these authorities would not lead us to conclude a receivership was not justified or would not have been ordered if Wang had responded on the merits.

We turn to Wang's argument that the judgment and CC&Rs required MacIntosh, who owned the property at the time of the settlement, to install fencing and lockable gates, but that her obligation did not transfer to *subsequent owners* when *she* failed to comply.[15] Wang made this argument repeatedly in the pet cemetery case as well as in this

---

[14] Other cases are even less relevant. In *Cohen v. Herbert* (1960) 186 Cal.App.2d 488, 495, the court reversed an order appointing a receiver only because the trial court had denied a reasonable request for a continuance. In *Morand v. Superior Court* (1974) 38 Cal.App.3d 347, 352-353, the court did not question the appointment of the receiver, but the scope of the receiver's power to initiate legal proceedings against unnamed parties. And in *De Leonis v. Walsh* (1905) 148 Cal. 254, 255, the plaintiff obtained a receiver in a suit to recover possession of real property, however, the receiver died after the plaintiff prevailed at trial. The *defendant* sought appointment of a new receiver, but the California Supreme Court concluded the expense was not warranted at that stage of the litigation.

[15] Wang argues Allen waived any claim that he had an obligation to install fencing when she agreed to the settlement at a court hearing in 2002. However, Allen said nothing to suggest she adopted Wang's interpretation of the obligation to install fencing and gates; she merely said she agreed to the settlement agreement. Indeed, Allen's attorney described the agreement for the trial court, including MacIntosh's duty to install

case. However, that argument did not convince the trial court, and it does not convince us. When pressed to resolve the issue, the trial court concluded that "if in fact MacIntosh didn't perform the fencing, which is required by the judgment, then the existing owner would have to provide the fencing. If it wasn't finished, for instance, subsequent owners would have that responsibility."

This is a legal question, not a factual one. (*Crosby v. HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 602 [interpretation of settlement agreement is a question of law]; *Societe Civile Succession Richard Guino v. Redstar Corp.* (2007) 153 Cal.App.4th 697, 701 [interpretation of the language of a judgment is a question of law]; *Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1121 [interpretation of CC&R provisions is a question of law].) In our view, the trial court was correct in determining Wang had to install fencing. It is true the judgment required MacIntosh to install a fence with lockable gates. "BARBARA G. MacINTOSH shall install a six foot high chain link with top rail fence, or other comparable type of fence, around the Pet Cemetery with lockable gates (one on Collier and one on Road Easement)." However, other provisions require subsequent owners to take on that responsibility. CC&R paragraph 2.f says "[a]ny owner or owners of the Property shall . . . provide and pay for . . . repair, upkeep and maintenance of such landscaping and improvements as may be on the Pet Cemetery." The provision then lists the items for which all owners are responsible, and the first item is "[a] six-foot high chain link top rail

---

the fencing, and then represented that "the CC&Rs would . . . run with the land and bind such new owner in the same way that the MacIntoshes would be bound presently."

fence, or other comparable type of fence, or permanent fencing, with lockable gates."

Moreover, the chain link fencing was viewed as a temporary fix "[u]ntil a more

permanent fence as required by, and building permits are issued by, the CITY OF LAKE

ELSINORE is installed." This obligation to install a more permanent fence is general and

does not mention MacIntosh. The judgment also specifies all property owners must "keep

the gates to the Pet Cemetery locked and . . . provide keys to any PET OWNER," an

obligation to maintain the pet cemetery in a secure fashion that would be empty if we

interpreted the judgment and CC&Rs in the manner Wang espouses. Thus, securing the

pet cemetery behind a barrier was an obligation owed by all owners of the property.

Installing a chain link fence may have been the least expensive option that would have

satisfied that obligation.

All that we have said so far accepts Wang's framing of the case to focus on

whether he could have obtained a more favorable result by avoiding the appointment of a

receiver and thereby avoiding additional scrutiny. But we believe that focus is too narrow

when applying the case-within-a-case method of evaluating whether attorney negligence

caused damages. The correct focus is whether "[a] plaintiff alleging legal malpractice in

the prosecution or defense of a legal claim . . . prove[s] that, but for the negligence of the

attorney, a better result could have been obtained in the underlying action." (*Orrick*,

*supra*, 107 Cal.App.4th at p. 1057.) As we interpret this case law, the plaintiff must show

he would have obtained a better result after trial of the issues or would have obtained a

more favorable settlement before trial. It does not permit a plaintiff to establish they could have prevailed at some intermediary stage of the litigation.

In many cases where courts have used the case-within-a-case method, a party unhappy with a settlement agreement seeks to prove attorney negligence resulted in a settlement that was valued too high or too low. Proving that attorney negligence caused a party to reach a negotiated settlement that misvalues the claims is difficult and especially difficult to do with the precision required to establish damages. The case-within-a-case method was designed to avoid claims for damages in that setting that are "based on pure speculation and conjecture." (*Orrick*, *supra*, 107 Cal.App.4th at p. 1057; see also *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 [the purpose of requiring proof that "the plaintiff would have obtained a more favorable judgment or settlement . . . is to safeguard against speculative and conjectural claims"]; see also *Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 166-167.) Proving someone would have obtained a better result after trial is a way to make concrete otherwise vague assertions that the person paid too much or too little in a settlement.

For example, *Orrick* arose out of alleged attorney malpractice in negotiating a divorce settlement that overvalued the wife's financial interests in the marital property. While in mediation, the couple signed a document styled as a "Property Settlement Agreement," which the husband said his attorney had told him was only a "term sheet" that did not contain all the terms necessary for it to be a final, binding agreement. (*Id.* at p. 1055.) However, the wife later convinced the court the agreement was enforceable, and

the court entered a judgment incorporating its terms. (*Ibid*.) The husband sued his attorneys for professional negligence, submitted an expert declaration saying the attorney's conduct in negotiating the settlement fell below the relevant standard of care, and sought damages in the form of the $500 million he paid his wife to settle claims he said were worth only $30 million.[16] (*Id*. at pp. 1055-1056.) The Court of Appeal held the husband could not establish damages because he "produced no evidence showing his ex-wife would have settled for less than she did, or that *following a trial*, he would have *obtained a judgment* more favorable than the settlement." (*Id*. at p 1058, italics added.)

*Marshak v. Ballesteros* (1999) 72 CalApp.4th 1514 applied the case-within-a-case method in the same way. *Marshak* also arose from a divorce settlement. The husband sought to set aside the settlement, but lost, and then sued his attorney. The husband complained the attorney had negligently acquiesced to a low valuation of the family residence (awarded to the wife) and a high valuation of the accounts receivable from his medical practice (charged to the husband). He claimed the negligence had cost him a total of $337,000 and presented a declaration concerning the valuation of the assets. (*Id*. at pp. 1516-1517, 1519.) The Court of Appeal concluded direct evidence of asset value was insufficient in a legal malpractice case, holding the husband "must also prove that his ex-

---

[16] The husband also sought to recover damages for his exposure to future claims by the wife due to the omission of a release clause and for potential liability under the securities and tax laws. The court held the threat of future harm was insufficient to create a legal cause of action for negligence. (*Orrick*, *supra*, 107 Cal.App.4th at p. 1058.) He also sought to recover the fees he paid his attorneys in the divorce action. However, the court concluded those fees could be recovered only as contract damages. (*Id*. at pp. 1060-1061.)

wife would have settled for less than she did, or that, following trial, a judge would have entered judgment more favorable than that to which he stipulated. Plaintiff has not even intimated how he would establish one or the other of these results with the certainty required to permit an award of damages." (*Id*. at p. 1519.)

Where there is no evidence the parties would have reached a more favorable settlement, the focus of the case-within-a-case method is showing a judgment after trial on the merits would have been better but for the attorney error.[17] (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 307-308 ["The trial of the 'suit within a suit' involves a determination of the merits of the underlying action; thus, there can be no recovery for a breach of duty without a preliminary showing as to the merits of an underlying claim"].) Framed in this way, Wang has failed to provide proof of causation. He could have prevailed against the motion for summary adjudication if he had presented evidence that he would have defeated the claim that he was in noncompliance after a trial in the pet cemetery case. But the evidence in fact contradicts that claim. No speculation is needed because the underlying issue was litigated until the pet cemetery was in compliance and the court had discharged the receiver.

---

[17] We recognize a client may recover damages when an attorney advises them to bring a baseless lawsuit that results in a reasonably foreseeable order to pay the opposition's attorney fees, and in such a case the client may establish causation "by proving that, but for the attorney's negligence, he would not have pursued the litigation and thus would not have incurred the damages attributable to the foreseeable risks that the attorney negligently failed to disclose." (*Mireskandari v. Edwards Wildman Palmer LLP* (2022) 77 Cal.App.5th 247, 262.) Such cases do not require proof that the client would have prevailed but for the attorney negligence because the problem is the claims had no merit in the first place.

After his appointment, the receiver investigated the property, reviewed the judgment and CC&Rs, and filed an initial report which determined Wang was not in compliance and recommended improvements and repairs. The receiver noted the lack of fencing and gates and recommended installing a six foot fence along the one open side of the property and installing two lockable gates. He also concluded there were several problems with the vegetation, including that it was "quite brown and possibly dead in various locations throughout the Pet Cemetery." He concluded the lawn required targeted reseeding, fertilizing, and hand watering, as well as repairs to the irrigation system. He also recommended trimming trees and restoring buffer plantings along the perimeter. These recommendations occurred in September 2017, and the receiver ultimately supervised the completion of the same work over the next two years, albeit over Wang's persistent objections. In his final report in May 2019, the receiver said the work had been completed to restore the lawn, repair the irrigation system, plant buffer vegetation, and install a fence and two lockable gates. He had earlier supervised the trimming and removal of trees. The trial court repeatedly confirmed the receiver's findings and approved the recommended work. It follows that Wang cannot establish he would have obtained a better judgment after a trial on the merits.

By persistently raising the very same objections he made in his statement prepared for Iverson at the outset of the case, Wang delayed the resolution of the case and drove up the costs for himself, the receiver, and the courts. He also demonstrated that the evidence from the pet cemetery case cannot establish what he needs to establish in his legal

40

negligence case—that the damages he incurred by having to bring the property into compliance were caused by his attorney's advice at the outset of the pet cemetery case. The entire litigation history of that case shows that the property was not in compliance until the receiver intervened and supervised maintenance, care, and installation of the fence and gates. Wang cannot use the case-within-a-case method to obscure this reality.

In theory, Wang could have prevailed on the motion to adjudicate if he had presented evidence that, but for the attorney errors, he would have reached a more favorable settlement of the dispute, for example, by negotiating a less expensive way of mitigating his compliance failures. But Wang has not even tried to present such a case. The errors he alleges have to do with the initial attempt to avoid the appointment of a receiver and avoid further scrutiny of how he was managing the property. He does not allege Iverson and Graff failed in attempts to satisfy the receiver with less expensive repairs, nor does he suggest that a less costly settlement of the dispute would have been a better outcome. This is probably because he pursued a scorched earth litigation strategy throughout the pet cemetery case. He contested the need for repairs and maintenance from the start. He has never accepted that he was obligated to install a fence with gates. He has consistently argued the pet cemetery vegetation was in acceptable shape. And he has always denied the need for repairs to headstones and other graveyard amenities. It is plain these choices were his own, not Iverson's or Graff's, as he made the same arguments in his draft statement, in contesting the receiver reports while represented by four different attorneys, and even in his briefs as a pro. per. litigant in this court. There is

41

no plausible way for Wang to blame Iverson and Graff for the failure to reach a less costly settlement of the pet cemetery case.

*Kessler v. Gray* (1978) 77 Cal.App.3d 284 (*Kessler*) is the only authority Wang cites as support for limiting the trial-within-a-trial to the hearing on appointing a receiver and for excluding the receiver's conclusions. He argues *Kessler* says the case-within-a-case method requires the underlying action to "be recreated through the trial-within-a-trial process to resolve the issues of causation and damages" and limits the evidence at trial to what "the court heard in the underlying case, plus such additional evidence that the court would have heard in the absence of such negligence."

*Kessler* does not do the work Wang suggests. Kessler purchased a business that operated a hotel restaurant and bar under a lease. However, the seller negotiated the sale knowing the bank would foreclose on the hotel and terminate the lease shortly after Kessler completed the purchase. After the foreclosure, Kessler stopped making payments on the business sale, the sellers sued, and Kessler filed a cross-complaint alleging the sale was fraudulent. But Kessler's attorney failed to prosecute the cross-complaint, which was dismissed as a result. The attorney admitted professional negligence but argued Kessler had not been damaged. The court held a trial on the merits of Kessler's fraud claim against the sellers and the question of collectability of the judgment. At trial, Kessler offered as evidence that the sellers knew of the impending foreclosure through the testimony of a former employee of the restaurant who said one of the sellers had told him " 'the bank was going to take the building over and shut the bar down.' " (*Kessler*, *supra*,

77 Cal.App.3d at pp. 289-290.) However, the attorney objected to this evidence on hearsay grounds and the court sustained the objection. The jury nevertheless found for Kessler and awarded him $25,500 in damages.

On appeal, the attorney argued the verdict was not supported by substantial evidence because, without the employee testimony, there was no evidence the sellers knew about the impending foreclosure. The Court of Appeal rejected this challenge because the hearsay objection was improperly sustained, and the attorney had invited the error. (*Kessler*, *supra*, 77 Cal.App.3d at pp. 290-291.) Thus, while *Kessler* does represent the rare case in which a trial court held a trial-within-a-trial to resolve an attorney malpractice claim, it does not support Wang's position that the method allows a plaintiff to prove causation or damages by proving they may have prevailed at an earlier stage of the litigation. To the contrary, *Kessler* is a case in which the plaintiff proved causation and damages by showing he would have prevailed on those issues at a trial on the merits. (See *Orrick*, *supra*, 107 Cal.App.4th at p. 1058.) Wang cannot make such a showing.

*Loube* explains why the proper focus is on the ultimate merits rather than some intermediary stage in the litigation. In that case, limited partners in a real estate partnership hired the Loube law firm to prosecute an action against two general partners. The firm filed a complaint, obtained a default, and—after a prove-up hearing—the court awarded each partner $248,102 in compensatory damages, $200,000 in punitive damages and $7,431 in attorney fees and costs. Later, however, the general partners filed a motion for relief from default in which they argued the damages award was improper because the

43

complaint stated no damages amount. The trial court denied the motion but amended the judgment, reducing the award of compensatory damages to the jurisdictional minimum of $25,000. (*Loube*, *supra*, 64 Cal.App.4th at pp. 424-425.)

The limited partners sued their law firm for professional negligence and breach of fiduciary duty, seeking to recover the amount of the original default judgment compensatory damages award less the actual award.[18] (*Loube*, *supra*, 64 Cal.App.4th at pp. 424-425.) In other words, they were trying to recover what they would have recovered if their attorneys had not negligently omitted a damages amount from their complaint. However, the trial court rejected that as a proper measure of damages and instead "required [the limited partners] to conduct a 'trial within a trial,' to prove that had the matter gone to trial they would have received an award of damages exceeding their actual recovery." (*Id.* at p. 425.) After hearing the limited partners' evidence, the court concluded that "had the matter gone to trial each [limited partner] would have been awarded no more than $12,850 compensatory damages and would have obtained no award of punitive damages." (*Ibid.*)

The limited partners appealed, arguing "but for the negligence of respondents each would have received . . . the $248,102 awarded to each [limited partner] following the uncontested prove-up hearing." (*Loube*, *supra*, 64 Cal.App.4th at p. 425.) The court

---

[18] As in this case, the plaintiff in *Loube* claimed breach of fiduciary duty as well as professional negligence. "The trial-within-a-trial method has been expanded to breach of fiduciary duty cases." (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 934.) The *Loube* court appears to have accepted as much, and neither Wang nor respondents argue to the contrary.

refused to "endorse a rule that determines liability by measuring the amount that a client *might* have received in connection with a claim, rather than the actual value of the claim." (*Id.* at p. 426.) The court explained, "It is well settled that 'an attorney is liable for malpractice when his negligent investigation, advice, or conduct of the client's affairs results in loss of the client's *meritorious claim*.'" (*Id.* at p. 426.) However, "[t]he question is not what *might* or even what *would have* happened absent the alleged malpractice, but what *should* have happened." (*Id.* at p. 427, italics added.) The court therefore "reject[ed] the argument that the trial court erred in compelling appellants actually to litigate their claim, rather than accepting the uncontested amounts accepted at the prove-up hearing. Those amounts were relevant only to what might have been awarded and are not particularly relevant to what should have been awarded; i.e., the value of appellants' claim." (*Ibid.*)

The same reasoning applies to Wang's case, though his attorney's alleged negligence affected his asserting a defense rather than a claim. The question here is not what might have happened, but what should have happened. And the record here demonstrates that what should have happened *did* happen—the receiver and the court intervened to enforce the judgment and the CC&Rs governing the use of the pet cemetery property.

B. *Claims of Judicial Bias*

Wang argues the trial judge displayed bias against him in its ruling on summary adjudication. He also contends the trial judge had the motivation to make biased rulings

45

because the judge in this case and the trial judge in the pet cemetery case are friends. He submits his own internet research to substantiate the friendship claim.

Wang moved for disqualification of the trial judge or, in the alternative, for peremptory challenge after the court had granted summary adjudication. The trial court issued a separate ruling rejecting these motions on the merits as well as for untimeliness. A determination on the question of disqualification is not an appealable order and may be challenged only by writ of mandate to this court. (Code Civ. Proc., § 170.3, subd. (d).) Wang already sought writ review, and a different panel of this court denied his writ petitions. (*Wang v. Superior Court* (E079815) Dec. 8 Order denying petition for writ of mandate; *Wang v. Superior Court* (E079774) Dec. 8 Order denying petition for writ of mandate; *Wang v. Superior Court* (E079720) Dec. 9 Order denying petition for writ of mandate.) The claim of bias has therefore been fully litigated and Wang did not prevail. He cannot resuscitate those claims on appeal of the substantive ruling.

If we were to consider the claims of bias on the merits, we would reject them. Most of Wang's objections are nothing more than disagreements with the trial court's ruling. That is simply inadequate as a basis for a claim of judicial bias. Indeed, even repeated, *erroneous* rulings—not present here—do not establish bias. (*McEwen v. Occidental Life Ins. Co.* (1916) 172 Cal. 6, 11 ["Erroneous rulings against a litigant, even when numerous and continuous, form no ground for a charge of bias or prejudice, especially when they are subject to review"].)

46

We do, however, want to clear up one area of confusion. Wang submitted to the trial court a separate statement of additional facts in opposition to the motion for summary adjudication. He complains the trial court was required to credit these statements because Iverson and Graff did not provide a response and argues the trial court disclosed its bias by ignoring these facts in its ruling. Several of these entries state that Allen provided no evidence to support her allegations in the original complaint. For example, one entry says "Allen provided no evidence to support the allegation that the owners fail[ed] to maintain[] a lockable gate and provid[e] keys." Another says Allen provided "no evidence" of damaged headstones. Still another entry says "The Minute Oder of 2/15/17 hearing said clearly: 'The Court having read and considered all of the timely submitted and filed documents finds and tentatively orders as follows: . . . The Motion is GRANTED. There is no substantive opposition to the motion by the current owners, so there is no dispute that the pet cemetery has not been maintained as required by the judgment entered on December 18, 2002. . . .'"

Wang's characterizations of these statements are wrong and reiterate his misunderstanding about the nature of Allen's declaration and of the trial court's order. (See *ante*, at pp. 7-8.) These are not statements of fact; they are legal conclusions. (And incorrect legal conclusions, at that.) Allen's declaration about the conditions of the pet cemetery constitutes evidence as a matter of law (Code Civ. Proc., § 437c, subds. (c) & (d)), and the minute order and the oral ruling each noted and relied on that evidence to conclude appointing a receiver was justified. The legal status of the declaration as

47

evidence and the interpretation of the court's order are legal issues, not facts, so Iverson and Graff had no reason to respond to Wang's statements on these points. Wang's position that the court erred (and displayed bias) by refusing to accept these supposed facts is baseless.

C. *Attorney Fees*

Wang challenges the award of prevailing party attorney fees on the ground that the court failed to give adequate reasons for rejecting his allegations that Iverson and his attorney "are liars so their recording of attorney fees is very likely highly exaggerated." He also complains the court approved a rate for Iverson's attorney that was too high.

The trial court awarded $174,757.64 in attorney fees using an hourly rate of $390. Counsel represented that he frequently charged clients more than $390 per hour, and though the trial court remarked that the rate was high for Riverside County, it nevertheless found the rate to be reasonable. The award request was supported by counsel's declaration and pages of itemized legal invoices dating from the initial consultation in July 10, 2018 to postjudgment communications in September 2022. The invoices set out detailed descriptions of the work performed over the entire period. The trial court disallowed hours claimed for a legal assistant, an unidentified attorney, and a contract attorney who worked on the motion for summary adjudication from March through June 2022, all of them charging lower rates.

"Code of Civil Procedure section 1033.5 sets forth the items that are and are not allowable as the costs recoverable by a prevailing party under section 1032, subdivision (b), 'as a matter of right.' " (*Chaaban v. Wet Seal, Inc*. (2012) 203 Cal.App.4th 49, 52.) Wang challenges the amount of attorney fees awarded, not whether respondents were entitled to recover costs, including attorney fees, as the prevailing parties. " 'The trial court's exercise of discretion in granting or denying a motion to tax costs will not be disturbed if substantial evidence supports its decision.' [Citation.] 'To the extent the statute grants the court discretion in allowing or denying costs or in determining amounts, we reverse only if there has been a ' "clear abuse of discretion" and a "miscarriage of justice." ' " (*Ibid.*)

We find substantial evidence supports the award and the court did not abuse its discretion in approving the billing rate and the overall amount as reasonable. Wang contested nothing specific in the invoices themselves, but he instead insinuated they had been falsified based on evidence he claimed showed Iverson and his attorney had lied about other matters. The court found these accusations both unpersuasive and irrelevant to the billing accuracy. We agree. As counsel for respondents noted and Wang confirmed, Wang has impugned the integrity of everyone with whom he disagrees throughout this litigation, including the other parties, their counsel, his own attorneys, and the judges and justices who have presided over the two cases. None of Wang's accusations have been substantiated, and his pattern of making unsubstantiated accusations undermines his credibility. Absent some specific reason to doubt the billing records, which Wang did not

49

provide, we conclude the trial court reasonably relied on them in making the attorney fee award.

D. *Motion for Reconsideration*

Finally, Wang asks us to reverse the trial court's order denying his motion for reconsideration. The trial court denied the motion because Wang filed it after the court had entered judgment, which deprived it of jurisdiction. Wang argues he was never served a notice of entry of order as required by Code of Civil Procedure section 1008, subdivision (a), the event that triggers the 10-day period for filing a motion to reconsider. He argues that as a result he should have been given 10 days after the entry of judgment to seek reconsideration. He is incorrect. Wang acknowledges he received service of the court's minute order which granted summary adjudication on July 7, 2022. A minute order served by the court serves as notice of entry of the order. (*Aquino v. Superior Court* (2021) 73 Cal.App.5th 104, 114-115.) Consequently, his motion to reconsider was untimely.

In any event, he would not be entitled to relief if we considered the merits. The subject of the motion for reconsideration is encompassed entirely within Wang's arguments on appeal and his arguments in prior petitions for writs of mandate, which we have rejected. Repeating an argument does not make it stronger. There is no basis for reversing the order denying the motion for reconsideration. All these issues have received full and fair consideration by the courts.

### III

### DISPOSITION

We affirm the judgment. Respondents are entitled to their costs on appeal.

NOT TO BE PUBLISHED IN OFFICAL REPORTS

RAPHAEL
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.